**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JON K. HEYER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 854** |
| | ) | |
| **PIERCE & ASSOCIATES, P.C.,** | ) | **Magistrate Judge Finnegan** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Jon K. Heyer defaulted on a home mortgage obligation, prompting the lender to retain Defendant Pierce & Associates, P.C. ("Pierce"), a law firm, to bring a foreclosure action. After obtaining a judgment, Pierce both filed with the foreclosure court and mailed to Plaintiff a "Notice of Sale Pursuant to Judgment of Foreclosure Under Illinois Mortgage Foreclosure Act." In this lawsuit, Plaintiff alleges that the Notice was false and misleading in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, because it: (1) threatened to sell his property at a time when that could not legally occur, and (2) failed to identify Pierce as a debt collector. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for partial summary judgment as to liability on these claims. Based on the Court's review of the parties' briefs and their arguments presented during a hearing on October 11, 2016, both motions are granted in part and denied in part.

## BACKGROUND

**A.    The Underlying Foreclosure Lawsuit**

Sometime prior to the events at issue in this case, Plaintiff bought property located in Mokena, Illinois to use as a personal residence (the "Property").    In connection with that purchase, Plaintiff incurred a mortgage obligation to Bank of America NA ("BANA") and subsequently went into default.   (Doc. 73-5 ¶¶ 5, 7, 8; Doc. 80 ¶¶ 5, 7, 8).   On September 27, 2010, BAC Home Loans Servicing, LP ("BAC"), a BANA subsidiary, retained the law firm of Pierce & Associates to bring a foreclosure action against Plaintiff in the Circuit Court for the 12th Judicial District, Will County, Illinois.   (Doc. 87-2 ¶ 1).   Pierce filed a Complaint for Foreclosure on October 13, 2010 seeking possession of the Property as well as payment of a deficiency judgment, attorneys' fees and costs (the "Foreclosure Case").   (Doc. 80 ¶ 11; Doc. 87-2 ¶ 2).

On November 15, 2011, the Circuit Court entered a judgment of foreclosure and sale against Plaintiff.   It also granted Pierce's motion to substitute BANA for BAC as the plaintiff in that case.   (Doc. 87-2 ¶ 3; Doc. 82, at 17).   In February 2012, the Property was sold at a sheriff's sale.   (Doc. 87-2 ¶ 4).

**B.    The Trial Loan Modification**

Notwithstanding the sale, BANA began working with Plaintiff on a modification to his loan.   (*Id.* ¶ 6).   On March 15, 2012, BANA mailed a written offer approving Plaintiff to enter into a trial period for a Fannie Mae Loan Modification.   The offer stated in relevant part:

> After you make all trial period payments on time, and if you continue to meet all of the eligibility requirements of your modification program, your mortgage will be permanently modified . . .

If you accept this Trial Period Plan as required above, and make your new trial period payments timely we will not conduct a foreclosure sale.

(Doc. 80 ¶ 19; Doc. 74-5, at 3-4). Plaintiff accepted the offer and made the required trial period payments in April, May and June 2012. (Doc. 80 ¶¶ 20, 21, 30).

On several occasions in June 2012, Plaintiff contacted Pierce to inquire about the status of his loan modification and confirm that he had been making the necessary payments. Pierce had "no record of a loan modification at all" and advised Plaintiff to speak with BANA directly. (Doc. 74-6, Ex. O, at 57-58, Pierce0056-57). By July 6, 2012, BANA still had not contacted Pierce regarding the loan modification, and an internal collection note entered that day stated:

client had said the FCL [foreclosure] was complete, so they [presumably BANA] seem unaware that they offered him a trial mod post sale. The borrower had sent us a scan of the mod reflecting this. I contacted [BANA] again. They need to give me an explanation as to why the borrower was offered a trial mod post sale and the status of his payments.

(Doc. 74-6, Ex. O, at 57, Pierce0056). Finally, on August 1, 2012, BANA instructed Pierce to prepare and file a motion to vacate the sheriff's sale of Plaintiff's property. (*Id.* at 55, Pierce0054). The circuit court granted the motion on August 21, 2012 and entered an order stating that the "Sale held February 22, 2012 is vacated due to loan modification review on the subject case." (Doc. 87-2 ¶ 5). Contrary to the allegations in the complaint, the court did not dismiss the case or vacate the judgment of foreclosure at that time.

## C.     Confusion Regarding Title on Plaintiff's Property

A few months later, on January 4, 2013, Fannie Mae (the entity providing the financing for the Loan Modification) approved a permanent modification of Plaintiff's

loan.  (Doc. 80 ¶ 26).[1]   The same day, Pierce entered the following in its collection notes:

> I called the [BANA] single point of contact number, spoke to (Linda?) . . . and she said that yes [Fannie Mae] did approve the perm loan mod, but the bank . . . is the entity that executes the final permanent mod docs. She said that because there was a judgment entered, and because there was a lien against the property and borrower Jon, [BANA] would not accept the perm. loan mod.  Therefore it was declined.  She said once judgment is cleared and removed, and the lien is removed, then [BANA] would execute the perm. mod docs.  I asked her if [BANA] would help the borrower with the removal/clearing of both, or if that would be something that we would do on our side, and she said that she would have to verify with someone in her department.

(*Id.* ¶ 62; Doc. 74-6, Ex. O, at 52, Pierce0051).  In an email dated January 7, 2013, BANA reiterated that it had run a check to ensure that Plaintiff "had clear title.  It appears that a judgment was found against the borrower.  We subsequently denied the modification due to that judgment.  Per our notes, it advised that in order for the perm mod can enter [sic] final approval, the judgment will need to be cleared."  (Doc. 74-6, Ex. O, at 51, Pierce0050).[2]

Plaintiff disputed that there was any lien on his Property and called Pierce on March 7, 2013 to explain that he thought the judgment in question was against a totally different person, John C. Heyer.  He also provided (1) a copy of a Title Policy issued by Chicago Title Insurance Company in April 2008 showing no judgment lien encumbering his Property, and (2) a copy of a Memorandum of Judgment that was entered against Robin Naser on April 7, 2005, in a case where John C. Heyer also appears in the

---

[1]     Fannie Mae is a corporation that provides mortgage financing by buying loans that banks and other lenders originate so they can fund new loans.  *See* http://www.fhfa.gov/SupervisionRegulation/FannieMaeandFreddieMac/Pages/About-Fannie-Mae---Freddie-Mac.aspx (last visited December 16, 2016).

[2]     Neither party has produced a copy of the judgment cited by BANA or any other information about it.

caption as a named defendant. (*Id.* at 49, Pierce0048; Doc. 80 ¶¶ 40-42; Doc. 73-3, Ex. N, at 15-37). A collection note that day states that the Pierce representative would "reach out to [BANA] and let them know about this and share the documentation with them." On March 11, 2013, Pierce spoke with BANA representative Amy Korte and explained "the situation with borrower Jon's permanent mod/lien against the property/wrong name on title search." At Ms. Korte's request, Pierce faxed her the documentary evidence the same day. (Doc. 74-6, Ex. O, at 49, Pierce0048).

In the meantime, Pierce moved forward with scheduling a sale, setting a date of April 17, 2013. But on March 14, 2013, BANA instructed Pierce to cancel the sale date and place the file on hold "due to loss mitigation." (*Id.* at 45, 48, 49, Pierce0044, Pierce0047, Pierce0048; Doc. 87-2 ¶ 11). The next day, on March 15, 2013, a Pierce representative spoke with Plaintiff by telephone. According to the collection note, Plaintiff inquired as to whether the lender was aware that "the lien against him should not have been against him" but rather someone else. The collection note reads as follows:

> Spoke with borrower Jon regarding the file being on hold. Told him his file is under loss mit[igation] review, and that is the reason why it is on hold. He asked if it was safe to assume that they are aware that the lien against him should not have been against him but against Jon C. Heyer. I told him that if they are reviewing his file for his loan mod[ification], it's safe to assume that this is the case.

(Doc. 80 ¶ 55; Doc. 74-6, Ex. O, at 48, Pierce0047). Plaintiff indicated that he would follow up with Robin Springer from BANA "whom he's working with." (Doc. 74-6, Ex. O, at 48, Pierce0047).

On March 18, 2013, BANA ended the hold on the Property and gave Pierce an "OK" to schedule a sale. (*Id.* at 45, 47, Pierce0044, Pierce0046). In an email dated

March 20, 2013, Ms. Korte acknowledged that the April 17, 2013 sale date was back in place. She further wrote (apparently in relation to the judgment that had been discovered and needed to be cleared): "we would need a copy of the clear title stamped and validated from the county recorder's office. Fannie Mae will only allow that. Once we receive that, a permanent modification will be created and sent to the borrower." (*Id.* at 47, Pierce0046). Two days later, on March 22, 2013, Pierce entered a "[s]ales scheduling hold . . . pending authorization to proceed." (*Id.* at 45, Pierce0044).

Plaintiff endeavored to obtain the documents needed to clear the lien against him, and shared this information with Pierce in a telephone call on March 22, 2013. In that call, Plaintiff reported that the county recorder's office told him "they do not validate and stamp title searches." The collection note reflects the Pierce representative "told him that I really don't know what to tell him and that I've exercised everything that I could have done on my end to help him." (*Id.* at 46, Pierce0045). During a second call shortly thereafter, the Pierce representative reiterated that "we wouldn't be able to do anything on our end any longer and that [Plaintiff] would have to work with his attorney and [BANA] directly regarding the title search and the perm mod." (*Id.*).

According to the collection notes, in April 2013, BANA gave Pierce another "OK" to proceed with the sale of Plaintiff's Property, and on May 8, 2013, Pierce set a sale date of August 29, 2013. (*Id.* at 45, Pierce0044). On May 17, 2013, Pierce entered a collection note stating that the file was "TO HOLD FOR FEMA." (*Id.*). Another note entered on June 21, 2013 stated: "file on hold per [BANA] for FEMA hold; do not

proceed to judgment without confirming that file is no longer on a FEMA hold." (*Id.* at 44, Pierce0043).[3]

## D.    The Notice of Sale

On August 7, 2013, Pierce mailed Plaintiff (and then filed in the Foreclosure Case) a Notice of Sale Pursuant to Judgment of Foreclosure Under Illinois Mortgage Foreclosure Act (the "Notice of Sale").  (Doc. 80 ¶¶ 12, 16; Doc. 73-2, at 30-32).  The Notice of Sale stated that "PUBLIC NOTICE IS HEREBY GIVEN" that the Property will be sold on August 29, 2013 "at public auction and sale to the highest bidder for cash." The Notice referenced a "Judgment amount" of $253,991.38, and also said that "IF YOU ARE THE MORTGAGOR (HOMEOWNER), YOU HAVE THE RIGHT TO REMAIN IN POSSESSION FOR 30 DAYS AFTER ENTRY OF AN ORDER OF POSSESSION, IN ACCORDANCE WITH SECTION 15-1701(C) OF THE ILLINOIS MORTGAGE FORECLOSURE ACT."  (Doc. 80 ¶¶ 13, 14, 16; Doc. 73-2, at 14-15).  Upon receiving the Notice, Plaintiff spoke on the phone with an acquaintance who is a doctor because he was experiencing abdominal distress and pain, lack of concentration, nausea, shock and anxiety due to the prospect of losing his home.  (Doc. 80 ¶¶ 17, 18).

The Notice of Sale was file-stamped in the Foreclosure Case on August 9, 2013, and Pierce received another "OK" to proceed with the sale from BANA on August 14, 2013.  The next day, on August 15, 2013, BANA contacted Pierce with the following message:

> This communication shall serve as written certification prior to foreclosure sale that we have conducted a review of [Plaintiff's] account as required . .

---

[3]    According to testimony from Pierce's corporate representative, Brian Merfeld, the FEMA hold was a general one and related to rainstorms. (Doc. 74-4, Ex. K, at 19, Merfeld Dep., at 62-63).  This particular foreclosure case, however, already had proceeded to judgment. (*Id.*, Merfeld Dep., at 65).

> . and have determined that, pursuant to those requirements, there is no
> reason to delay the scheduled sale. Accordingly, you should continue with
> the scheduled sale.

(Doc. 87-2 ¶ 14; Doc. 74-6, Ex. O, at 26, 42, 44, Pierce0025, Pierce0041, Pierce0043).

One week later, on August 22, 2013, BANA instructed Pierce to postpone the sale and

so Pierce reset the sale to September 29, 2013. (Doc. 74-6, Ex. O, at 42, Pierce0041).

Then on August 30, 2013, BANA contacted Pierce and requested that the sale be

cancelled, and Pierce did so. (Doc. 87-2 ¶ 15).

**E.      The Permanent Modification**

On November 19, 2013, BANA sent Plaintiff a letter stating that he had

"successfully complet[ed] your trial modification" and been "approved for a permanent

loan modification." (Doc. 80 ¶ 31; Doc. 73-2, at 127). BANA noted that it "required

additional time to process [the] permanent modification and, as a result, we are taking

[certain] steps to permanently modify your loan and bring your account current." (Doc.

73-2, at 127). The first step was:

> Your permanent modification will take effect as of the date it would have
> become effective if we had timely processed your modification. This date
> is known as the Modification Effective Date. The Modification Effective
> Date for your loan is 07/01/2012.

(Doc. 80 ¶ 23; Doc. 73-2, at 127). At the direction of BANA, Pierce voluntarily

dismissed the Foreclosure Case in Will County on February 13, 2014. (Doc. 82 ¶ 16;

Doc. 82, at 16).

**F.      Plaintiff's Lawsuit**

Plaintiff filed this lawsuit on February 6, 2014, charging Pierce with violating the

following provisions of the FDCPA: 1692d, 1692e, 1692e(5), 1692e(10), and

1692e(11).[4]  The cross-motions for summary judgment concern only Sections 1692e, e(5), e(10) and e(11).

**DISCUSSION**

**I.      Standard of Review**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  *See also Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 125 F. Supp. 3d 810, 813 (N.D. Ill. 2015).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  On cross-motions for summary judgment, "the Court must constru[e] the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made."  *Herkert v. MRC Receivables Corp.*, 655 F. Supp. 2d 870, 875 (N.D. Ill. 2009) (quoting *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008)).

**II.     The FDCPA**

"The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices."  *Swearingen v. Portfolio Recovery Assocs., LLC*, 892 F. Supp. 2d 987, 991 (N.D. Ill. 2012) (quoting *Bass v. Stolper,*

---

[4]      During oral argument on October 11, 2016, Plaintiff advised that an additional claim under Section 1692f(6) is withdrawn.  It should also be noted that seven months before filing this lawsuit, Plaintiff separately sued BANA on July 2, 2013.  *Heyer v. Bank of America et al,* No. 13 CV 4805.  That lawsuit alleged (in part) that BANA was in breach of the agreement to provide the promised loan modification and sought both injunctive relief (compelling BANA to grant the modification) and monetary damages.  The BANA lawsuit was dismissed on May 23, 2014 following a settlement.  (Docs. 39, 40, 41 in Case No. 13 CV 4805).

*Koritzinsky, Brewster & Neider, SC*, 111 F.3d 1322, 1324 (7th Cir. 1997)). "A basic tenet of the Act is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt, deserve the right to be treated in a reasonable and civil manner." *Bass*, 111 F.3d at 1324 (internal quotations omitted). "In the most general terms, the FDCPA prohibits a debt collector from using certain enumerated collection methods in its efforts to collect a 'debt' from a consumer." *Id.* Claims against debt collectors "are to be viewed through the eyes of the 'unsophisticated consumer.'" *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996). "The unsophisticated consumer may be 'uninformed, naïve, [and] trusting,' . . . but is not a dimwit, has 'rudimentary knowledge about the financial world,' and is 'capable of making basic logical deductions and inferences.'" *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012).

The FDCPA only applies if certain threshold requirements are satisfied: (1) the defendant must qualify as a "debt collector"; and (2) the debt collector must have made a communication to a consumer "in connection with the collection of any debt." *See Stricklin v. Jefferson Capital Sys., LLC*, No. 11-CV-201-DRH, 2011 WL 5325735, at *5 (S.D. Ill. Nov. 3, 2011). For purposes of these cross-motions, there is no dispute that Pierce is a debt collector, Plaintiff is a consumer, and the mortgage obligation is a "debt" under the statute. The parties disagree as to whether the Notice constitutes a communication sent "in connection with" the collection of the debt. The relevant FDCPA provisions are found in 1692e, which prohibits the use of "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Plaintiff specifically claims that Pierce violated three subsections: e(5), e(10), and e(11).

### III. Analysis

#### A. Sending the Notice is Generally Actionable

Pierce first argues that its conduct in sending the Notice of Sale of the Property is not actionable under the FDCPA because it was merely "comply[ing] with state court procedures" for foreclosure cases. (Doc. 83, at 8-9) (citing *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 875 (7th Cir. 2015) (the FDCPA "does not so much as hint at being an enforcement mechanism for other rules of state and federal law."), and *Harold v. Steel*, 773 F.3d 884, 887 (7th Cir. 2014) ("Section 1692e does not even hint that federal courts have been authorized to monitor how debt-collection litigation is handled in state courts.")). In Pierce's view, "[c]laims like this one, predicated on state court procedures are not actionable in federal court." (Doc. 83, at 8).

This argument is unavailing because the Seventh Circuit recently joined numerous other circuits in holding that "representations may violate § 1692e of the FDCPA even if made in court filings in litigation." *Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 810-12 (7th Cir. 2016) (citing *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 176-77 (3d Cir. 2015); *Goldman v. Cohen*, 445 F.3d 152, 155-56 (2d Cir. 2006); *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 231 (4th Cir. 2007); *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 449-50 (6th Cir. 2014), as amended (Dec. 11, 2014); *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 573–74 (8th Cir. 2015); *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1031–32 (9th Cir. 2010); *James v. Wadas*, 724 F.3d 1312, 1316 (10th Cir. 2013); *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1297–1300 (11th Cir. 2015)). Pierce's motion for partial summary judgment on the theory that state court filings cannot implicate the FDCPA is denied.

## B. Sections 1692e(5) and e(10)

The Court next turns to whether sending the Notice of Sale violated Sections 1692e(5) or 1692e(10). The FDCPA prohibits debt collectors from making a "threat to take any action that cannot legally be taken or that is not intended to be taken." 15 U.S.C. § 1692e(5). The statute also proscribes "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain any information concerning a consumer." *Id.* § 1692e(10). *See also Ruth v. Triumph Partnerships*, 577 F.3d 790, 797-98 (7th Cir. 2009).

Plaintiff alleges that the Notice of Sale was false and deceptive because it threatened a sale of his Property at a time when that was not legally possible. His initial theory as set forth in both the complaint and the first amended complaint was apparently based on an erroneous docket entry in the Foreclosure Case from August 21, 2012. That docket entry stated: "Judgment and Sheriff Sale is vacated and case is dismissed without prejudice." (Doc. 73-2, at 10). Plaintiff thus alleged in this federal lawsuit that the Property could not legally be sold because (1) the foreclosure action had been dismissed, and (2) both the judgment and sheriff's sale had been vacated. (Doc. 8 ¶¶ 10, 14, 16, 18, 23, 27; Doc. 73-2, at 10). If these allegations were true, Plaintiff would have a compelling case. *Friello v. Bank of New York*, No. 12 C 3270, 2012 WL 4892856, at *7 (N.D. Ill. Oct. 15, 2012) (debtor stated valid claim under Section 1692e(5) by alleging that the defendant sent a notice of sale despite not having a valid judgment of foreclosure). Unfortunately for him, the actual court order in the Foreclosure Case (also entered on August 21, 2012) made clear that while the sale had

indeed been vacated, the court had *not* dismissed the Foreclosure Case or vacated the judgment.

As a result, Plaintiff's theory on summary judgment is very different and more challenging. He now argues that the threatened sale was not legally possible because sale of the Property would have put BANA in breach of his loan modification agreement. Pierce objects that Plaintiff is trying to amend his pleadings through summary judgment, and insists the threat to sell was entirely truthful and lawful in any event.

### 1. Plaintiff Did not Amend the Pleadings Through Summary Judgment

The Court disagrees with Pierce that Plaintiff is seeking to inject new claims into this case, or "amend his complaint through arguments in his brief in opposition to summary judgment." (Doc. 83, at 4) (citing *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) and *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997)). As the Seventh Circuit explained long ago, "the complaint need not identify a legal theory, and specifying an incorrect theory is not fatal." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). *See also Smith v. Zimmer US, Inc.*, No. 16 C 4717, 2016 WL 2344368, at *1-2 (N.D. Ill. May 3, 2016). This remains true "even . . . in the wake of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Whitaker v. Milwaukee County, WI*, 772 F.3d 802, 808 (7th Cir. 2014) ("[P]laintiffs are not required to plead legal theories.").

Plaintiff's complaint and first amended complaint both alleged that Pierce violated Sections 1692e(5) and e(10) by sending him the Notice of Sale on August 7, 2013. The theory surrounding those violations certainly has shifted, but Plaintiff has not raised entirely new *claims. Cf. Grayson*, 308 F.3d at 817 (where the plaintiff alleged before the

district court that the defendant agency retaliated against him because he filed an EEOC charge on April 2, 1997 opposing unlawful discrimination, he could not argue for the first time on appeal that the retaliation also stemmed from his filing a separate charge of discrimination on June 3, 1997); *Auston*, 116 F.3d at 255 (where the plaintiff's promissory estoppel and tortious interference with employment contract claims were not included in the complaint, they could not be added at the summary judgment stage).

The Court recognizes that Plaintiff's late revelation of his new theory had some effect on the course and scope of discovery, particularly with respect to efforts to obtain information in the possession of BANA. Nevertheless, Pierce fails to identify any specific additional discovery it still needs in order to properly address Plaintiff's motion for summary judgment. (Doc. 83, at 4). In fact, Pierce has not only responded to Plaintiff's motion but also filed a cross-motion for summary judgment of its own. During oral argument on October 11, 2016, Pierce further conceded that Plaintiff discussed the situation with the lien on his title (which relates to the new theory of liability) during his deposition on August 25, 2015. (Doc. 74-3, at 13-14, Heyer Dep., at 41-44). This was before discovery closed on September 11, 2015, but Pierce did not seek an extension of that deadline or request any additional discovery. (Doc. 63). Given the Court's ruling below and the absence of any demonstrable prejudice to Pierce, there is no merit to Pierce's assertion that Plaintiff improperly amended his pleadings through summary judgment. This aspect of Pierce's motion is denied.

### 2.     BANA Had a Legal Right to Sell Plaintiff's Property on the Date that Notice of Sale was Sent

The Court next considers the merits of Plaintiff's new theory: that even with the Foreclosure Case still open and a valid judgment in hand, Pierce nonetheless made a

false, deceptive, or misleading statement when it notified Plaintiff of the impending auction of his Property. He reasons that the Notice of Sale contained a "threat to take any action that cannot legally be taken or that is not intended to be taken" (15 U.S.C. § 1692e(5)) because sale of the Property would have put BANA in breach of a contract with Plaintiff. Even were this so (the facts concerning the alleged contract and breach are unclear), the Court is not persuaded that evidence of such a breach would be sufficient to demonstrate that Pierce violated the FDCPA when it sent the Notice of Sale.

### a.    Legal Impossibility Requirement

Factually, this case is quite distinct from those in which courts have found liability under Section 1692e(5) based on legal impossibility. One of those cases, which also involved Pierce, was *Melnarowicz v. Pierce & Assocs., P.C.*, No. 14 C 7814, 2015 WL 4910748 (N.D. Ill. Aug. 17, 2015). There the court found Pierce liable for sending a notice of sale where a foreclosure action had been automatically stayed by statute due to bankruptcy. By sending the notice of sale anyway, Pierce implied that the foreclosure suit would continue "'when, legally,' that 'cannot come to pass' because of the bankruptcy stay." *Id.* at *2 (quoting *Lox v. CDA, Ltd.*, 689 F.3d 818, 825 (7th Cir. 2012)). In a similar vein, in *Karr v. Med-1 Solutions, LLC*, No. 1:12-CV-01182, 2014 WL 1870928 (S.D. Ind. May 7, 2014), the defendant's threat to take possible legal action to collect a debt was false because "[t]he statute of limitations to initiate legal proceedings had long passed." *Id.* at *5.

Finally, in *Lox v. CDA, Ltd.*, the debt collector threatened the plaintiff with a lawsuit and a court order to pay attorneys' fees if he did not pay a medical debt. 689

F.3d at 823. But the Seventh Circuit found this was "not a possible outcome" since Illinois and federal courts disallow the award of attorney fees absent a contractual or statutory exception, and none existed there. *Id.* Thus, the court held that "the statement at issue was not only false, but misleading[,] on its face…" *Id.* at 823, 824. *See also Tallman v. Freedman Anselmo Lindberg LLC*, No. 11-3201, 2013 WL 489676, at *18 (C.D. Ill. Feb. 8, 2013) (statement that the defendant could get attorney fees if it took the plaintiff to court for failure to pay a bank loan was false because the loan document "does not indicate that Plaintiff agreed to pay attorney fees if the lender were required to file suit to collect the debt.").

As noted, the case at hand is entirely different. The Foreclosure Case was never stayed due to a bankruptcy filing. And on the date the Notice of Sale was sent, BANA already had a judgment entitling it to sell the Property to satisfy that judgment. Therefore, on the day Pierce sent the Notice there was no legal obstacle preventing the sale as there would have been had the Foreclosure Case been dismissed and the judgment vacated as Plaintiff mistakenly alleged.

### b.    Factual Basis for Plaintiff's New Theory

To avoid dismissal, Plaintiff's new theory is that the Notice was false for a different reason; the sale could not "legally be taken," he asserts, because had BANA sold the Property at auction, this would have constituted a breach by BANA of a contract with Plaintiff. This breach of contract theory is premised on Plaintiff's assertion that the trial loan modification BANA sent him on March 15, 2012 (post-judgment in the Foreclosure Case) constituted a contractual offer whereby BANA agreed it would not conduct a foreclosure sale of the Property if Plaintiff (1) made his three trial payments in

April, May and June 2012 (which there is no dispute he did), and (2) "continue[d] to meet all of the eligibility requirements of your modification program." (Doc. 73-1, at 10; Doc. 74-5, at 3-4). Neither party has identified the contours of the "eligibility requirements," but Plaintiff claims that the only possible impediment to his permanent modification was a judgment BANA said it found on his title in January 2013. Unfortunately, the record does not contain a copy of the BANA-located judgment, a specific description of its contents, or any information about how the "lien" came into existence (e.g., did some third party mistakenly cause it to be attached to Plaintiff or his Property). Nor is there information concerning the nature of the search that was conducted that led to the discovery of the lien.

As noted, the record reveals only that BANA claimed there was a "lien" against the Property and the borrower, and that until the judgment was cleared and the lien removed, BANA would not execute the permanent modification documents. (Doc. 80 ¶ 62; Doc. 74-6, Ex. O, at 52, Pierce0051). At that time, Plaintiff contended that "the lien against him should not have been against him" but rather someone else. (Doc. 80 ¶ 55; Doc. 74-6, Ex. O, at 48, Pierce0047). He then endeavored to obtain the documents that BANA said Fannie Mae required before the permanent modification could proceed, namely, "a copy of the clear title stamped and validated from the county recorder's office." (Doc. 74-6, Ex. O, at 47, Pierce0046). Plaintiff later reported to Pierce that the county recorder's office told him "they do not validate and stamp title searches[.]" (*Id.* at 46, Pierce0045).

In light of the information missing from the record concerning the nature of the lien, Plaintiff directs the Court to what *he* believes is the judgment that was potentially

clouding his title: an April 7, 2005 Memorandum of Judgment against Robin Naser in a case where John C. Heyer was also a named defendant. There is no dispute now that John C. Heyer is an entirely different person than Plaintiff, and it appears that the April 2005 Memorandum is not even a judgment against John C. Heyer in particular. (Doc. 73-3, at 19). Plaintiff is the one who produced the Memorandum of Judgment to Pierce after telling Pierce that the "lien against him should not have been against him but against Jon C. Heyer." (Doc. 74-6, Ex. O, at 48, Pierce0047). There is no evidence in the record, however, confirming whether this is actually the document or data that BANA was focused on when it placed a hold on the permanent loan modification pending receipt of a clear title validated by the county recorder's office. (*Id.* at 47, Pierce0046). And while Plaintiff sent Pierce a clean title report, it was not a current one (the title report he sent was from April 7, 2008).

Based on this record, the Court is unable to find as a matter of law that there was no lien encumbering the Property (whether mistakenly or not) and thus preventing Plaintiff from qualifying for a permanent loan modification as of the date Pierce sent the Notice of Sale. (Doc. 73-3, at 29). Moreover, even assuming the record established the absence of a lien, or established that BANA mistakenly *was* relying on the Memorandum of Judgment described above as the basis for withholding the permanent modification, this would not change the outcome here. What Plaintiff must establish to prevail on the FDCPA claim is that Pierce either threatened to sell his Property when that could not legally occur, or did not really intend to sell the Property yet misrepresented that it would do so. 15 U.S.C. § 1692e(5). He loses under the second theory of liability given the uncontroverted deposition testimony from Jessica

Woodbridge, BANA's 30(b)(6) representative, that BANA *did* intend to sell the Property as of August 7, 2013 when the Notice of Sale was sent. (Doc. 73-2, at 93, Woodbridge Dep., at 34). There is also no dispute that Pierce intended to sell the Property when it sent the Notice.

As for whether BANA (through its attorneys at Pierce) was legally capable of selling the Property, Plaintiff initially focuses on the fact that BANA ultimately agreed on November 19, 2013 that he had been eligible for a permanent loan modification as far back as July 1, 2012. This is shown in the November 19, 2013 letter from BANA officially offering him a permanent modification and stating that July 1, 2012 would be the effective date because this was when the modification "would have become effective if we had timely processed your modification." (Doc. 73-2, at 44). In Plaintiff's view, this demonstrates that he was in a binding permanent modification on August 7, 2013 when Pierce sent the Notice of Sale. He thus concludes that the Property could not legally be sold on that date and so the Notice's statement that a foreclosure sale was to occur on August 29, 2013 was false. (Doc. 73-1, at 12).

The problem with this argument is that it is all based on hindsight rather than the facts as they existed on the day the Notice was sent. As of August 7, 2013, Plaintiff and BANA had not yet resolved the issue of the lien; Plaintiff had not provided the documents reportedly required by Fannie Mae (he told Pierce that the county recorder's office would not validate and stamp title searches); and the permanent loan modification had *not* been approved. In addition, BANA had a judgment of foreclosure in hand that gave it the legal authority to sell the Property at auction (indeed, Pierce had already sold the Property once but vacated the sale at BANA's request). (Doc. 83, at 6). *Compare*

*Friello*, 2012 WL 4892856, at *7. This Court agrees with Pierce that though Plaintiff was in discussions with BANA to potentially enter into a permanent modification "one was never finalized prior to the sending of the Notice." (*Id.*). This view finds support in the testimony of Ms. Woodbridge, who confirmed that the permanent modification was "implemented" in December 2013. (Doc. 73-2, at 102, Woodbridge Dep., at 43).

To address the absence of a binding permanent modification as of the date the Notice was sent on August 7, 2013 Plaintiff shifts his focus back to the March 2012 offer for a temporary modification. Specifically, Plaintiff says he had satisfied the terms of that offer and, as noted, BANA had promised in return not to sell his Property in such circumstances. If BANA could not have sold the Property without being in breach of the March 2012 agreement, Plaintiff posits, it was attempting (through Pierce) to take an action that was not legal under Section 1692e(5), rendering the Notice of Sale false and misleading. (Doc. 87, at 8-9).

As an initial matter, Plaintiff fails to reconcile this position with his factual assertion that the agreement he describes as the trial modification "ended on June of 2012." (Doc. 73-5 ¶ 22) (citing Doc. 73-2, at 103, Woodbridge Dep., at 44). Thus, the agreement was not even in effect as of August 2013 when the Notice was sent. A more fundamental problem is that the breach of contract theory of liability lacks any legal support. Plaintiff directs the Court to *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012), but that was not an FDCPA case, and does not address the issue posed here. The *Wigod* court examined whether Wells Fargo breached a contract when it declined a permanent loan modification after offering the plaintiff a trial period loan modification that would become permanent if she complied with all terms. Plaintiff had

made the necessary loan payments, and the lower court assumed for purposes of the Rule 12(b)(6) motion to dismiss that she "complied with all other obligations" as well. *Id.* at 558. On appeal, the Seventh Circuit rejected Wells Fargo's argument that the trial period loan modification was not an enforceable offer because it was conditioned on the bank's "further review of [the plaintiff's] financial information to ensure she qualified." *Id.* at 561. Rather, the court held that "when [a] promise is conditioned on the performance of some act *by the promisee* or a third party, there can be a valid offer." *Id.* (emphasis in original).

*Wigod* would have been helpful had BANA ultimately denied the loan modification and Plaintiff thus persisted in his breach of contract claim. In that event, discovery undoubtedly would have focused on the eligibility requirements for the permanent loan modification, the details of the "lien," and whether BANA was entitled under the agreement to insist that Plaintiff provide evidence of clean title in a form acceptable to Fannie Mae. This Court has not been provided such information in this FDCPA case against Pierce. Regardless, it is not enough for Plaintiff to prove that sale of the property would have given rise to a successful breach of contract claim against BANA in order to establish an FDCPA violation against Pierce.

Where, as here, Plaintiff and BANA had a dispute regarding eligibility for a permanent loan modification, Pierce's liability for sending the Notice of Sale cannot hinge on whether a judge or jury is eventually persuaded that BANA would have been in breach of contract had it proceeded with the foreclosure sale. Instead, the focus must be on whether, on the day the Notice was sent by Pierce, it was legally impossible for the Property to be sold at auction in the Foreclosure Case such that Pierce made a

false statement. *Cf. Panko v. Pellettieri & Assocs., P.C.*, No. 04 C 3981, 2004 WL 2191574, at *1 (N.D. Ill. Sept. 27, 2004) ("[A] violation of § 1692e occurs at the time a false, misleading, or deceptive letter is sent because the conduct necessary for the alleged violation is complete at the time of the mailing.").

While the Notice of Sale undoubtedly angered and frustrated Plaintiff, it was not false or deceptive on the date that it was sent; the Notice accurately informed him that the Property was to be sold at a foreclosure sale in August, 2013. Pierce both intended for this to happen, and had a valid judgment in hand allowing it to do so. This Court declines to expand liability under Section 1692e(5) by construing that statute to mean that an action "cannot legally be taken" if it *can* be taken but doing so may give rise to a separate cause of action for breach of contract and damages.

### 3. Pierce Was Entitled to Rely on BANA in Sending the Notice of Sale

Because the Court finds no violation of Section 1692e(5), it need not address Plaintiff's additional argument that Pierce either knew or should have known that the threatened sale could not occur in August 2013 without BANA breaching a contract, and is thus responsible for blindly following BANA's unlawful direction to sell. (Doc. 87, at 6). While the facts are far from clear, this argument is premised on Plaintiff's belief that Pierce was "extensively involved in the decision regarding [his] loan modification," and acted unreasonably in relying on information from BANA "it knew to be false." (*Id.* at 7, 9). But the concept of reasonable reliance is associated with the FDCPA's bona fide error affirmative defense, which only comes into play once a violation has been established. 15 U.S.C. § 1692k(c). In certain circumstances, reliance on a client can qualify as a procedure reasonably adapted to avoid the violation in question and thus

insulate the debt collector from liability. *See, e.g., Hyman v. Tate*, 362 F.3d 965, 966, 968 (7th Cir. 2004) (even without a "formal agreement," debt collector had adequate procedures for purposes of bona fide error defense where it instructed the client to only send files that were not in bankruptcy and promptly removed from the collection list any accounts that were referred by mistake). *Compare Kasalo v. NCSPLUS Inc.*, No. 10 C 1643, 2011 WL 2582195, at *4 (N.D. Ill. June 27, 2011) (citing *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 948-49 (9th Cir. 2011)) ("[T]he bona fide error defense does not protect a debt collector whose reliance on a creditor's representation is unreasonable. Unwarranted reliance on a client is not a procedure to avoid error.").

Plaintiff does not cite any cases suggesting that a debt collector's reasonable reliance, or lack thereof, can affect whether a collection notice violates Section 1692e(5) in the first place. Indeed, as Plaintiff readily acknowledges, "our test for determining whether a debt collector violated § 1692e is objective, turning not on the question of what the debt collector knew but on whether the debt collector's communication would deceive or mislead an unsophisticated, but reasonable, consumer." *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003). For the reasons already stated, this Court does not believe a reasonable consumer who knew the bank was refusing to sign off on a permanent modification would be deceived by the Notice here. That Notice truthfully informed Plaintiff that the Property was to be sold at auction later that month at a time when BANA and Pierce intended to do so and when such a sale was expressly authorized by a foreclosure judgment.

Ultimately, the crux of Plaintiff's lawsuit is that BANA did not handle his loan modification properly, resulting in a threat to sell his Property that was in breach of contract. Viewing the record as a whole, Plaintiff has failed to demonstrate that Pierce is liable under the FDCPA given the circumstances presented here.

### C.    1692e(11)

Both parties also seek summary judgment on Plaintiff's Section 1692e(11) claim. Under that provision, a debt collector must disclose certain information in communicating with consumers. An initial communication must state that "the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11). In addition, all subsequent communications must disclose "that the communication is from a debt collector . . . ." This subsection has an exception, however, and "shall not apply to a formal pleading made in connection with a legal action." *Id. See also Smith v. Greystone Alliance LLC*, No. 09 C 5585, 2011 WL 1303377, at *4 (N.D. Ill. Mar. 29, 2011). The parties agree that the Notice of Sale qualified as a "subsequent" as opposed to initial communication, (Doc. 80 ¶ 12), and that it did not disclose Pierce as a "debt collector."

### 1.    The Notice of Sale is Not a "Formal Pleading"

Pierce argues that no disclosure was required under Section 1692e(11) because the Notice of Sale constituted a formal pleading made in connection with a legal action. The statute does not define the term "formal pleading," and there is no case law in this circuit directly on point. Pierce attempts to analogize the Notice to civil warrants and affidavits filed in Tennessee collection proceedings, and to bankruptcy proofs of claim. (Doc. 83, at 10-11). The Tennessee cases are not particularly instructive because they

turn on an interpretation of Tennessee procedures, and there is a split among those courts as to whether civil warrants and affidavits are in fact formal pleadings for purposes of Section 1692e(11). *Compare White v. Sherman Fin. Group, LLC*, 984 F. Supp. 2d 841, 851 (E.D. Tenn. 2013) (finding the civil warrant and affidavit "fall under the 'formal pleading' exception"), *with Murr v. Tarpon Fin. Corp.*, No. 3:10-CV-372, 2014 WL 546690, at *14 (E.D. Tenn. Feb. 10, 2014) (though "a civil warrant is a *pleading*, it is not considered by Tennessee courts to be a *formal* pleading.") (emphasis in original).

With respect to proofs of claim, Pierce directs the Court to *In re Brimmage*, 523 B.R. 134 (Bankr. N.D. Ill. 2015), where the court held that "when the Defendants filed [a] proof of claim, it was a legal pleading" exempt from the validation letter requirements of Section 1692g. *Id.* at 141. Section 1692g is the only provision in the FDCPA besides Section 1692e(11) that creates an exception for "formal pleadings." *Id.* at 141. Pierce claims that a proof of claim in bankruptcy is similar to a notice of sale in a foreclosure proceeding because both serve a notification function. In that regard, Pierce characterizes a proof of claim as "a formal document filed in a bankruptcy proceeding [that] is intended to give the debtor and the bankruptcy trustee notice of a creditor's claim," and says that the Notice of Sale was likewise "a formal filing intended to give both the court, the public as well as the plaintiff notice of Pierce's intent to enforce the previously obtained judgment." (Doc. 83, at 12).

It is not clear that a proof of claim, which a creditor files to "establish the validity and the total, unbifurcated amount of [a] debt," is the same as a notice of sale, which helps execute on a judgment. *In re Duggins*, 263 B.R. 233, 238 (Bankr. C.D. Ill. 2001). Plaintiff urges the Court to follow *Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358 (D.

Md. 2010), where a Maryland court relied on Federal Rule of Civil Procedure 7 in holding that interrogatories served on the plaintiff did not constitute a formal pleading under Section 1692e(11). *Id.* at 367. Rule 7 lists the following as "pleadings" allowed in a federal case: "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." FED. R. CIV. P. 7(a). The court conceded that Rule 7(a) "does not provide a definitive interpretation of the FDCPA's reference to a 'formal pleading,'" but found it "a persuasive indication that Congress did not intend for all documents filed in connection with a lawsuit to fall within the formal pleading exceptions." 749 F. Supp. 2d at 367. *See also Zevgolis v. Greenberg Law Firm, P.C.*, Civ. No. 3:10CV625-DWD, 2011 WL 251024, at *4 (E.D. Va. Jan. 26, 2011) (reaching similar conclusion for "debtor's interrogatories" based on the definition of "pleading" in Black's Law Dictionary).

Plaintiff correctly observes that the Notice of Sale does not fall into one of the above-cited categories under Rule 7. While the Notice was filed in a state court as opposed to federal court action, it likewise does not qualify as a "formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses." *People v. Pace*, 386 Ill. App. 3d 1056, 1061, 899 N.E.2d 610, 615 (4th Dist. 2008) (citing Black's Law Dictionary 1191 (8th ed. 2004)). Certainly, not every document filed in connection with a lawsuit should be deemed a formal pleading exempt from the disclosure requirements of Section 1692e(11). *See, e.g., Adams v. David B. Schumacher, PC*, No. 13-CV-2301, 2014 WL

6977695, at *4 (D. Or. Dec. 9, 2014) ("[T]here is no indication in the legislative record or case law . . . suggesting the 'legal pleading' exemption is to apply generally to any court or legal document."). Yet for fear of liability, some debt collectors have apparently taken to placing debt collection language on every single court filing that cannot be categorized as a complaint, answer, counterclaim or crossclaim. *See, e.g., In re Revere*, No. PROC.07-1006, 2007 WL 4879279, at *1 n.1 (Bankr. N.D. Ind. Oct. 22, 2007) (commenting on the defendant's "annoying habit of placing [debt collection] language . . . on all of its filings (counsel's appearance, a notice of extension of time, the answer, the joint pre-trial order, and stipulations with plaintiff's counsel).").

This Court need not determine the exact contours of a "formal pleading" as contemplated by Section 1692e(11). Given the FDCPA's broad remedial purpose, the Court merely holds that the Notice of Sale in this case does not qualify as a "formal pleading." *See Caprio v. Healthcare Revenue Recovery Grp., LLC*, 709 F.3d 142, 148 (3d Cir. 2013) ("As remedial legislation, the FDCPA must be broadly construed in order to give full effect to these purposes."). It is not a pleading as defined under Rule 7 or Black's Law Dictionary, and it does not perform functions similar to those documents. Any concern about excess verbiage in court filings could be avoided by simply including the disclosure language on the version of the Notice sent directly to Plaintiff. Pierce's failure to do so is a violation of the FDCPA.

## 2. The Notice Was Sent in Connection with an Attempt to Collect a Debt

Pierce argues that it still cannot be liable under Section 1692e(11) because the Notice of Sale was not sent in connection with an attempt to collect a debt. (Doc. 83, at 12). In support Pierce cites *Cavallaro v. Law Office of Shapiro & Kreisman*, 933 F.

Supp. 1148, 1156-57 (E.D.N.Y. 1996). The plaintiff in *Cavallaro* allegedly defaulted on a loan secured by a lien on a co-op apartment. *Id.* at 1150. The defendant law firm was hired to commence foreclosure proceedings and sent the plaintiff a personal "Notice of Sale of Collateral" (along with a general Notice of Sale of Cooperative Apartment). *Id.* at 1151. The plaintiff filed suit alleging in part that the personal notice violated Section 1692e(11) because it did not contain the required disclosure. *Id.* at 1156. The court disagreed, finding that even though the notice was "addressed to Plaintiff and made reference to the indebtedness," it was "not an attempt to collect a debt, nor an effort to obtain information. The personal notice of sale is an attempt to satisfy conditions precedent to a foreclosure on a secured agreement." *Id.* at 1156-57. The court also observed without elaboration that "the purpose of § 1692e(11), to prevent false or misleading representations by a debt collector to a debtor, is unoffended by an omission of § 1692e(11) disclosure in a foreclosure notice." *Id.* at 1157.

Plaintiff, on the other hand, points to *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380 (7th Cir. 2010), and *Melnarowicz v. Pierce & Assocs., P.C.*, No. 14 C 7814, 2015 WL 4910748 (N.D. Ill. Aug. 17, 2015). In *Gburek*, the Seventh Circuit held that letters sent to a debtor offering to discuss "settlement options" and "foreclosure alternatives" constituted "an offer to discuss . . . repayment options, which qualifies as a communication in connection with an attempt to collect a debt." *Id.* at 386. The defendant had argued that the "in connection with" requirement could not be met in the absence of an explicit demand for payment, but the court said this was "just one of several factors that come into play in the commonsense inquiry of whether a communication from a debt collector is made in connection with the collection of any

debt." *Id.* at 385. Also relevant is "[t]he nature of the parties' relationship," as well as "the purpose and context of the communications – viewed objectively." *Id.*

The *Melnarowicz* court similarly found that a "Notice of Initial Case Management Conference" that Pierce had sent to the plaintiffs in a foreclosure case met the requirement of being "in connection with the collection of a debt." 2015 WL 4910748, at *4-5. Relying heavily on *Gburek*, the court found that the notice's invitation to "look into" a mortgage foreclosure mediation program was an "invitation to resolve a debt." *Id.* at *4. Even without that language, the court held that viewed objectively in context, "the purpose [of the notice], at least in part, is to prosecute the [foreclosure] lawsuit and thus, to foreclose and make good the debt." *Id.* at *5.

Pierce contends that the Notice of Sale is unlike the communications at issue in *Gburek* and *Melnarowicz* because it said nothing about settlement or repayment options. (Doc. 83, at 14, 15). While not every filing in a foreclosure case will automatically meet the "in connection with" standard, the Notice here constituted an attempt to sell the Property, and the entire purpose of the sale was to collect on Plaintiff's mortgage debt. 735 ILCS 5/15-1507(c). Viewed objectively, given the purpose of the sale referenced in the Notice, combined with the fact that Plaintiff's only relationship with Pierce was in the context of debt collection, this Court is satisfied that the Notice was sent "in connection with" an attempt to collect a debt.

Pierce disagrees, claiming that the Notice purportedly "addressed the public at large" as opposed to Plaintiff in particular. (Doc. 83, at 13, 15). There is no dispute, however, that Pierce mailed the Notice directly to Plaintiff, and that it contains language addressed to him as the mortgagor: "IF YOU ARE THE MORTGAGOR

(HOMEOWNER), YOU HAVE THE RIGHT TO REMAIN IN POSSESSION FOR 30 DAYS AFTER ENTRY OF AN ORDER OF POSSESSION, IN ACCORDANCE WITH SECTION 15-1701(C) OF THE ILLINOIS MORTGAGE FORECLOSURE ACT." (Doc. 73-2, at 15, 16). Pierce's motion for summary judgment on the "in connection with" element of Plaintiff's Section 1692e(11) claim is denied.[5]

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Partial Summary Judgment (Doc. 73) and Defendant's Cross-Motion for Partial Summary Judgment (Doc. 81) are both granted in part and denied in part.

ENTER:

Dated: January 9, 2017

SHEILA FINNEGAN
United States Magistrate Judge

---

[5] The Court rejects Pierce's largely undeveloped argument that Plaintiff's Section 1692e(11) claim fails because the Notice of Sale was not material. (Doc. 83, at 16) (citing *Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 627 (7th Cir. 2009)) ("If the average unsophisticated consumer would not be influenced by a statement rightly or wrongly claimed to be literally false, the case should end right there."). It is not at all clear that the materiality requirement applies to omissions under Section 1692e(11). *See, e.g., Warren v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374 (4th Cir. 2012) (the requirement that false representations be material does not apply to omissions under Section 1692e(11)), abrogated on other grounds, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016); *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 324 (7th Cir. 2016) (rejecting any requirement of materiality for omitting required disclosures under Section 1692g(a)(2)); *Smith v. Greystone Alliance, Inc.*, No. 09 C 5585, 2015 WL 4325495, at *6 (N.D. Ill. July 15, 2015) (concerns about materiality are irrelevant for purposes of Section 1692e(11)). Assuming materiality is necessary under Section 1692e(11), the Court finds that an unsophisticated consumer would believe the Notice of Sale constituted an attempt to collect a debt, and the failure to include the proper debt collection disclosures was a material omission.